506

## In re Samuel J. Kauffman.

*Wm. Clarke Mason* and *Franklin E. Barr*, for Board of Censors.

*D. P. Hibberd*, for respondent.

GORDON, JR., J., Jan. 13, 1931.—This is a proceeding for the disbarment of the respondent, Samuel J. Kauffman. He and others were indicted in the Quarter Sessions for the offenses of conspiracy to extort and extortion, and on April 17, 1930, they were acquitted of the charges. None of the defendants offered evidence in answer to the case of the Commonwealth, and it is difficult to understand, from a reading of the testimony, by what process of reasoning the jury reached the conclusion that it did. However, as the authorities are clear that the acquittal of an attorney on a criminal charge does not prevent his discipline or disbarment for the same cause (Wolfe's Disbarment, 288 Pa. 331; Kennedy's Disbarment, 178 Pa. 232; Snyder's Case, 301 Pa. 276), the acquittal of the respondent in this case does not control our consideration of the petition before us.

When the jury had reached its verdict of not guilty, our brother Lewis, who presided at the trial, directed the district attorney to transmit a copy of the stenographic record of the proceedings to the Committee of Censors for their consideration and action, and thereafter that committee filed the petition for disbarment which is now before us. At the hearing on the petition, it was agreed that the testimony taken at the trial of the criminal case against the respondent should be offered in evidence and accepted, subject to objection and exception to its general and particular competency and relevancy, as if taken on the hearing of the petition. With the offering of this testimony the petitioner rested. The respondent was then given an opportunity to make answer to the charges, but his counsel stated that he did not desire to do so. At a later date, counsel of record for the respondent withdrew his appearance, and other counsel appeared for him, who requested that he be heard in answer to the charges against him. Accordingly, we fixed a time for hearing the respondent and his witnesses. At that hearing, however, the respondent's attorney appeared and stated that, after further consultation with his client, the latter had decided to offer no testimony and to make no answer to the charge. We thereupon cautioned counsel that, although the respondent was at liberty to do as he deemed best for his own interests, we would be compelled to draw the natural and obvious inference from his silence and refusal to refute or explain the testimony against him.

It is unnecessary to go in detail into the many acts of professional dishonor of which the evidence overwhelmingly convicts this respondent. He was the confederate and leader of a group of persons who were engaged in a

systematic and repeated extortion of money from a physician of this city, by the abuse of the criminal process, and most of the money so extorted he embezzled from the different female clients whom he pretended to represent. It will be sufficient to review so much only of the testimony as will indicate his method of operation and the nature of his misconduct. According to the testimony of a number of women who gave evidence at the trial, a certain Dr. Leo J. Faltermayer, of this city, committed abortions upon them, and at their solicitation. Dr. Faltermayer, however, denied his guilt in each instance, and we need not form or express an opinion upon that subject, as his guilt or innocence of the crimes charged neither justifies nor aggravates the misconduct of the respondent. After the alleged abortions, the respondent procured representation of the women who claimed to be so mistreated, and either issued, or threatened to issue, warrants for the offenses they charged against the doctor. By this means the respondent succeeded in extorting from the doctor various sums of money, ranging as high as $5000 in one instance, in settlement of the supposed charges against him. His explanation for the payment of such sums was that, although he had not been guilty of the offenses, he could not afford to permit a public exposure of the charges, as the mere accusation of such an offense would be fatal to his professional reputation and life. A single instance will indicate the method of procedure which the respondent adopted in conducting this campaign of extortion. Having been retained by a woman named Cecelia Brooks, who claimed to have been caused to abort by the doctor, the respondent caused a warrant to be issued against him, and sent a constable to his office to place him under arrest. The constable, who was a confederate of the respondent, suggested to the doctor, immediately upon his arrest, that the case should be settled. After making this suggestion the constable, instead of taking his prisoner to the station house and slating him in the regular and orderly manner, accompanied him on his professional rounds, and later took him to the respondent's office. After a conversation with the respondent, the doctor was then taken to his home, where he procured $5000. This money he brought back to a street corner near the respondent's office, paid it over in settlement of the case to one of the respondent's confederates, and was then released from arrest by the constable. A number of other persons took part in the carrying out of this blackmailing scheme, but are not essential to an understanding of it, although they illuminate and emphasize its dishonorable and criminal character.

Having thus extorted $5000 from Dr. Faltermayer, the respondent committed a further act of professional misconduct, which alone would require us to strike him from the roll of attorneys. He then visited his client and her husband, in company with another man, who was falsely represented to his client as the attorney for the doctor. With the husband and wife, the respondent then conducted, through his co-conspirators, a fictitious negotiation for settlement of the case, in which, aided by the false attorney, who was present, his clients were persuaded to settle the case for $900, of which $200 was to be paid to him as a fee. $700 was then paid in cash to the clients, and, to further carry out his deception, a check for $200 made out to his order by the bogus attorney for the doctor was handed over, in the client's presence, and a release without expressed consideration was given to the fictitious attorney, which was later delivered to the doctor himself. By this means the respondent cheated his client out of $4300. The procedure in this case was typical of that followed in the numerous cases involved in the criminal charges against the respondent. In each instance the doctor, whether

508

guilty or innocent of the charges against him, was threatened and black-mailed out of large sums of money, and in each instance but a small·percentage of the amount extorted from the doctor was paid over to the clients.

This testimony clearly discloses a course of systematic extortion and embezzlement on the respondent's part, the truth of which cannot be doubted when we consider his failure to deny the evidence against him in any particular, and leaves but one course open to us. The respondent's conduct displays such gross moral turpitude, and such a want of appreciation of the fundamental principles of professional honor and common honesty, that to continue to hold him out as worthy of trust and confidence would do a wrong to the public and bring dishonor and discredit upon the profession. The rule for disbarment is, accordingly, made absolute, and it is ordered that the prothonotary shall strike from the roll of attorneys the name of the respondent, Samuel J. Kauffman, and shall give notice of this action to the Orphans' Court of Philadelphia County and to the Supreme and Superior Courts of Pennsylvania.